# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

RONALD LARKINS,

                                            Plaintiff,

    vs.                                                                           9:13-CV-0219 (NAM/ATB)

COUNTY OF CAYUGA, *et al.*,

                                            Defendants.

_____

RONALD LARKINS
Plaintiff, *pro se*

BRYAN N. GEORGIADY, Esq.
FRANK W. MILLER, Esq.
Attorneys for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c). Presently before the court are plaintiff's motion and defendants' cross-motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. Nos. 25 and 26). Plaintiff has filed a reply. (Dkt. No. 31). For the following reasons, this court will recommend that plaintiff's motion for summary judgment be denied, that defendants' cross-motion for summary judgment be granted, and that the complaint be dismissed in its entirety.

**I.**     <u>Facts</u>

Plaintiff brings this pro se civil rights complaint under § 1983 based on events arising out of his confinement at the Cayuga County Jail ("CCJ"). Plaintiff, who first

began wearing prescription glasses in 2006, arrived at CCJ without these glasses on or about August 24, 2010. During the intake interview conducted by Nurse Wallace, plaintiff noted that he wore glasses, but did not have them with him, and did not discuss any other significant concerns during the interview. (Dkt. No. 26-3 ("Wallace Aff.") at ¶¶ 8, 11, 14). In October 2010, plaintiff submitted an Inmate Request Form for an eye exam, explaining that he was "constantly squinting because of near-sightedness" and that he had two pair of glasses at home but lost them. (*Id.* at Ex. B). Nurse Wallace responded that the Jail did not have an optometrist for routine vision care and would not be able to provide glasses. (*Id.* at ¶¶ 15, 17, and Ex. B).

In November 2010, plaintiff woke up with blurry vision in his left eye. (Dkt. No. 26-1 ("Def. Rule 7.1 Statement") at ¶ 16). Though this problem did resolve on its own, (Def. Rule 7.1 Statement at ¶¶ 18-19), plaintiff saw Dr. Kooi regarding his left eye and his deteriorating vision on December 30, 2010. (Dkt. No. 26-4 ("Kooi Aff.") at ¶ 3-4). During this visit, plaintiff complained of nearsightedness, explaining that his vision had been getting worse for two weeks. (Wallace Aff. at ¶ 22; Kooi Aff. at ¶ 4). He did not, however, mention any problems with headaches. (Wallace Aff. at ¶ 22). Dr. Kooi examined plaintiff and found the pupils of plaintiff's eyes to be equal, round, and reactive to light and accommodation, the fundus of each eye in good condition and noted that plaintiff was not in any distress. (Kooi Aff. at ¶¶ 6, 7). Dr. Kooi recommended that plaintiff see an outside ophthalmologist, if possible, but did not believe he was in need of emergency medical care. (Kooi Aff. at ¶¶ 9, 11).

In light of Dr. Kooi's recommendation, Nurse Wallace contacted Dr. Speck, the

2

doctor who CCJ generally used for inmates' optometry issues. When Nurse Wallace spoke with someone in Dr. Speck's office, Nurse Wallace was told that the doctor declined to see plaintiff, but would reconsider if "something further" developed. Based on Dr. Kooi's findings, Nurse Wallace states that she did not recognize any indications of an urgent need for medical care. (Wallace Aff. at ¶ 27). When Nurse Wallace relayed the message from Dr. Speck's office to Dr. Kooi he did not specifically tell the nurse to attempt to schedule an appointment with another provider. Plaintiff never contacted the infirmary again regarding problems with his vision. (Wallace Aff. at ¶ 34).

A few months later, plaintiff filed a grievance regarding the fact that he had not yet been scheduled to see an outside optometrist. In this grievance, plaintiff asserted that his vision was "no better." (Dkt. No. 26-5 ("Gleason Aff."), Ex. A). Following this grievance, Nurse Wallace contacted additional providers in the area, even though as far as she knew nothing about plaintiff's vision had changed. However, she was unable to locate a provider who was willing to see plaintiff. (Wallace Aff. ¶¶ 36-37). Plaintiff filed a second grievance in June 2011, stating that his vision had "gotten worse." (Gleason Aff., Ex. B). After making additional attempts to locate an optometrist, Nurse Wallace found a provider, but was unable to schedule an appointment until February 6, 2012. (Wallace Aff. at ¶¶ 40, 41). Plaintiff was transferred out of the Jail on December 29, 2011. During his vision screening at Elmira Correctional Facility, his vision was found to be 20/70. (Wallace Aff, Ex. D). In February 2012, it was found to be 20/200. (Wallace Aff. Ex. E).

Plaintiff brings this action against Sheriff Gould and the County of Cayuga alleging that he was denied adequate medical care while at CCJ.

## II. <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v.*

*Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

Where, as here, cross motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment." *Natural Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id*. (citation omitted). Moreover, "[t]he district court considering a summary judgment motion . . . must . . . be 'mindful of the underlying standards and burdens of proof . . . .'" *U.S. S.E.C. v. Meltzer*, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (citations omitted). Accordingly, with respect to plaintiff's motion, he bears a much greater initial burden; he "must show that the evidence supporting [his] claims is so compelling that no reasonable jury could return a verdict for the defendant." *Id*. *Accord, McCarthy v. Wachovia Bank, N.A.*, 759 F. Supp. 2d 265, 273 (E.D.N.Y. 2011).

**III. Defendants**

    **A. Applicable Law**

        **1. Municipal Liability**

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Id*. at 694. To establish municipal liability, the policy must actually cause the violation of

5

constitutional rights, and it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979). The plaintiff must allege facts demonstrating: "(1) the existence of an officially adopted policy, custom, or practice and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiff's federally protected rights." *Best v. City of New York*, No. 11 Civ. 4475, 2012 WL 5458054, at *3 (S.D.N.Y. Nov. 8, 2012) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-404 (1997)).

A municipality may not be held liable on a "respondeat superior" theory. *Monell*, 436 U.S. at 691. However, a policy, custom or practice of an entity may be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996)). However, a single incident of illegality does not ordinarily rise to the level of a custom or policy. *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 440 (S.D.N.Y. 2013) (citations omitted).

### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be

personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007).

**B.    Application**

Plaintiff names the County of Cayuga as a defendant. However, plaintiff fails to state a claim for municipal liability against Cayuga County. There is no evidence of a "policy or custom" of Cayuga County that caused plaintiff any constitutional violation. The County cannot be liable simply because plaintiff was housed in its jail. Consequently, Cayuga County may be dismissed on this basis alone.

Sheriff Gould is named as a defendant in the caption of the complaint, but plaintiff's only factual allegations regarding defendant Gould are that he was aware of plaintiff's medical needs through two grievances and that he is "statutorily responsible for inmates medical care."[1] (Compl. at 5). Despite the sparse allegations and

---

[1] However, the grievances do not appear to have been directed to Sheriff Gould. The only indication that Sheriff Gould was even aware of plaintiff's situation is a September 6, 2011 letter from the Chairman of the Citizens Policy and Complaint Review Council to Sheriff Gould explaining that the Council accepted plaintiff's grievance and that facility officials shall ensure that inmates[] are afforded the medical treatment prescribed by the responsible licensed medical

7

evidence regarding defendant Gould, the court has considered the merits of plaintiff's claim against him and has also considered whether to allow plaintiff an opportunity to amend the complaint to name another individual who was personally involved in the alleged violations.[2] Defendants have already submitted affidavits from Dr. Kooi and Nurse Wallace–the individuals involved in plaintiff's medical care, and the court finds that plaintiff's claim fails on the merits. For the reasons described herein, the court has determined that no reasonable fact finder could conclude that anyone at CCJ acted with deliberate indifference.

## IV. Denial of Medical Care

### A. Applicable Law

In order to state a claim based on constitutionally inadequate medical treatment,[3] the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v.*

---

professional. (Dkt. No. 31-3 at 8).

[2] Plaintiff attempted to amend his complaint on October 31, 3013. (Dkt. No. 22). It appeared that plaintiff sought to add a medical malpractice claim against Dr. Kooi. (Dkt. No. 22 at 1). This court denied the motion without prejudice on November 8, 2013 and gave plaintiff thirty days to submit a new motion to amend, explaining that plaintiff would need to include a complete proposed amended complaint and could not name Dr. Kooi as a defendant and include only a state law negligence claim against him. (Dkt. No. 24 at 4). On November 14, 2013, plaintiff submitted his motion for summary judgment. (Dkt. No. 25). Plaintiff did not submit a new motion to amend.

[3] Plaintiff's claim arose while he was a pretrial detainee at the Cayuga County Jail, and is, therefore, properly analyzed under the Fourteenth Amendment. *See, e.g., Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009). However, regardless of whether a deliberate indifference claim is brought pursuant to the Eighth or Fourteenth Amendment, the standard is the same. *Id.* at 72.

8

*Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia*, *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'" *Bellotto v. County of Orange*, 248 F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto*, 248 F. App'x at 236 (citing, *inter alia*, *Chance v. Armstrong* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that

risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan*, 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* v. *Goord,* 467 F.3d at 281.

Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan*, 511 U.S. at 835. Therefore, any claims of medical malpractice, or disagreements with treatment are not actionable under section 1983. *Ross v. Kelly*, 784 F. Supp. 35, 44-45 (W.D.N.Y. 1992), *aff'd* 970 F.2d 896 (2d Cir. 1992) (table).

### B. Application

Plaintiff accuses defendants of deliberate indifference to plaintiff's serious medical needs when they failed to ensure that he be scheduled for an optometry appointment so that he could obtain prescription eye glasses in a reasonably timely

fashion. Defendants argue that plaintiff cannot meet either the subjective or the objective prong of the standard.

With respect to the objective prong, defendants contend that plaintiff's medical needs were not "serious." Among the relevant factors for determining whether a serious medical need exists are "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance*, 143 F.3d at 702 (citation omitted). Diminished eyesight can, under certain circumstances, be sufficiently serious to provide the basis for a claim for the denial of medical care. *See Koehl v. Dahlsheim*, 85 F.3d 86, 88 (2d Cir. 1996) (holding that a prisoner who was denied prescription eyeglasses necessary to correct double vision and a loss of depth perception, resulting in headaches and injuries from walking into objects as a result, had a serious medical condition).

Plaintiff alleges that he suffered severe headaches or migraines during the time that he did not have prescription glasses. *See Johns v. Goord*, No. 9:09-CV-1016 (NAM/RFT), 2010 WL 3907826, at *4 (N.D.N.Y. Sept. 30, 2010) (explaining that plaintiff's allegations of "extreme eye pain, excruciating headaches, a loss of vision and loss of balance" were sufficient to withstand defendants' motion to dismiss). Defendants contend that plaintiff failed to complain about headaches while at CCJ, but have presented no evidence to show that he did not suffer from the severe headaches alleged. It appears that plaintiff had a standing order for ibuprofen and

tylenol and could receive up to 3 tables 4 times per day without contacting medical staff. (Dkt. No. 31 at 14). Plaintiff alleges that he would take 3 ibuprofen at a time for the pain. (Dkt. No. 26-6 at 46). Additionally, plaintiff's medical records from Auburn Correctional Facility confirm that he has consistently complained that he experienced severe headaches during his time at CCJ. (Dkt. No. 25-3 at 21).

Moreover, plaintiff asserts that his eyesight deteriorated significantly due to the fact that he did not have prescription glasses for over a year, resulting in permanent damage. *See Davidson v. Scully*, 155 F. Supp. 2d 77, 87 (S.D.N.Y. 2001) ("Where a prisoner's vision will degenerate in the absence of corrective glasses, the need for vision correction can be a sufficiently serious need.") (citing *Koehl*, 85 F.3d at 87). Defendants have not produced any evidence that the delay did not cause the degeneration.[4]

Defendants argue that because plaintiff spent time in the law library and did legal research, his daily activities were not impacted. However, the court notes that plaintiff was having trouble with distance vision, not reading. Therefore, the fact that he could still read and write without incident did not mean that his long-distance vision was not deteriorating, or causing significant issues. Indeed, plaintiff asserts that he had difficulty identifying other inmates. (Dkt. No. 26-6 at 63-64 (explaining

---

[4] Defendants argue that this deterioration occurred after his time at CCJ, and therefore, defendants are not responsible for the deterioration. It does appear that after he left the Jail in December 2011, plaintiff's vision was 20/70, and two months later it was 20/200. However, it is not clear that the year that plaintiff spent at the Jail without glasses did not cause this deterioration. Based on the record now before this court, a reasonable juror could find that the delay in care caused plaintiff's vision to further deteriorate.

that he could only see people at the end of the hall if he squinted)). Under these circumstances, the court will assume that there is an issue of fact as to whether plaintiff's medical needs were serious.

However, turning to the subjective prong of the test, the court finds that plaintiff cannot show that anyone at CCJ acted with deliberate indifference, and therefore recommends dismissing plaintiff's medical indifference claim on the merits. In order to establish "deliberate indifference," plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin v. Goord*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff must show that the defendant acted with the equivalent of subjective recklessness. *Id*. (citing *Farmer*, 511 U.S. at 839-40).

Here, the record is devoid of evidence from which a reasonable factfinder could conclude that any of plaintiff's medical providers were aware that he was suffering from severe headaches, that his vision was deteriorating to any great extent, or aware of any other information that would indicate that plaintiff was suffering from a condition requiring urgent medical care. To the extent plaintiff asserts that CCJ employees should have been aware of his worsening condition based on his grievances, the information provided in these grievances is insufficient to alert the staff that plaintiff suffered from a serious medical need. In his first grievance, plaintiff simply stated that his vision was "no better." (Gleason Aff., Ex. A). Even the second grievance only stated that his vision "has gotten worse" with no additional details about problems that the vision was causing, the extent to which it deteriorated,

13

or that he was suffering in any other way. (Gleason Aff., Ex. B). After his visit on December 30, 2011, plaintiff never contacted the infirmary again regarding his vision.[5] (Wallace Aff. at ¶ 34). Plaintiff also never requested a visit with the doctor to request stronger pain medication for his headaches.[6]

Plaintiff asserts that Nurse Wallace ignored Dr. Kooi's orders and that this demonstrates deliberate indifference. Although under certain circumstances, ignoring the orders of a doctor could demonstrate deliberate indifference,[7] the court finds that based on the undisputed facts, Nurse Wallace did not ignore Dr. Kooi's orders. As detailed above, she contacted CCJ's usual eye care provider who declined to see plaintiff at that time, and told Nurse Wallace to let his office know if plaintiff's condition became more urgent. She relayed this message to Dr. Kooi, who did not tell her to call other providers. (Wallace Aff. at ¶ 32). Nurse Wallace states that she believed Dr. Kooi would have told her to do so had plaintiff's condition been urgent. (*Id.* at ¶ 33). Dr. Kooi explains that he did not believe immediate eye care was required, and he was not aware of any other significant changes in plaintiff's vision

---

[5] Plaintiff explains that he assumed he "would be seen in a reasonable time frame." (Dkt. No. 31-3 at 3). However, this does not change the fact that officials at CCJ had no reason to believe that serious harm could occur.

[6] Plaintiff himself does not assert that he informed anyone in the medical unit who would be able to assist with his vision issues that his vision was deteriorating, instead only claiming that he told Sergeant Gleason and other inmates that it was getting worse. (Dkt. No. 31 ("Pl. Response to Rule 7.1 Statement") at ¶ 39).

[7] *See Paul v. Bailey*, 09 Civ 5784, 2013 WL 2896990, at *16 (S.D.N.Y. June 13, 2013) ("Ignoring the express orders of a doctor is more than merely negligent and is sufficient to withstand a motion to dismiss.") (citing *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987)) (Report and Recommendation).

prior to his transfer. (Kooi Aff. at ¶¶ 11, 12). Nurse Wallace's actions do not rise to the level of deliberate indifference. Indeed, Nurse Wallace explained that based on Dr. Kooi's examination of plaintiff she did not personally recognize an urgent need for medical care, and that she never received any information that plaintiff's vision had a material impact on his ability to live or function in the jail or that his health or safety was in danger. (Wallace Aff. at ¶¶ 27, 45, 46). Plaintiff presents no evidence to suggest that Nurse Wallace knew that plaintiff suffered from a substantial risk of serious harm.

No evidence suggests that any officials at CCJ were aware that serious harm could occur if an appointment with an ophthalmologist was not scheduled immediately. The court finds that no reasonable juror could conclude that personnel at CCJ were deliberately indifferent to plaintiff's condition, meaning that they "kn[ew] of and disregard[ed] an excessive risk to [plaintiff's] health or safety" and that they were "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . also dr[e]w the inference. *Farmer*, 511 U.S. at 837. The court will, therefore, recommend denying plaintiff's motion and will recommend granting defendants' cross-motion for summary judgment.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that plaintiff's motion for summary judgment (Dkt. No. 25) be **DENIED**, and it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 26) be **GRANTED** and that the complaint be **DISMISSED IN ITS ENTIRETY**.

15

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: June 27, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge